IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| FRIENDS OF THE FLATHEAD RIVER, a Montana Nonprofit Corporation,<br><br>       Plaintiff,<br><br>vs.<br><br>U.S. FOREST SERVICE, et al.,<br><br>       Defendants. | CV 22–90–M–DWM<br><br><br>OPINION & ORDER |

    Plaintiff Friends of the Flathead River ("Friends") seeks declaratory and injunctive relief against the United States Forest Service related to the Blankenship Bridge and a nearby gravel bar on the Middle Fork of the Flathead River near Coram, Montana (the "Gravel Bar"). Specifically, Friends seeks a declaration that the Forest Service violated the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271, 1274, 1283, and the Forest Service Organic Act, through the Travel Management Rule, 36 C.F.R. §§ 212.52, 212.57. Friends moved for a temporary restraining order and preliminary injunction enjoining dispersed overnight camping southwest of the Blankenship Bridge on the Gravel Bar, pending release and implementation of a new Comprehensive River Management Plan for the Flathead River. The request for a temporary restraining order was effectively denied by the Order

setting a hearing on Friends' motion for injunctive relief. (*See* Doc. 8 at 1 (noting area restriction in place until July 15, 2022, and that "[g]iven this prohibition on use, a temporary restraining order is unnecessary at this time").) Because Friends has not carried its burden of showing a likelihood of success on the merits of its claims at this point, Friends' motion for preliminary injunctive relief is also denied.

## BACKGROUND

### I. Factual Background

More than 200 miles of the Flathead River, including the portion at issue here, are part of the National Wild and Scenic River System. 16 U.S.C. § 1274. The Flathead River was designated a Wild and Scenic River in 1976, and in 1980 the Forest Service issued the Flathead Wild and Scenic River Management Plan ("the Flathead Plan"). (Doc. 5-2.) The Flathead Plan was "intended to be a comprehensive document for management of the Flathead National Wild and Scenic River for a five-year period beginning with the date of approval," to be "reviewed yearly after the conclusion of the summer recreation season." (*Id.* at 29.) Chapter IV of the Flathead Plan addresses the Blankenship Bridge and Gravel Bar area. (*See id.* at 49–65.) The Flathead Plan states that "[m]otorized overland vehicle travel in the corridor is generally limited to established roads due to terrain and vegetation." (*Id.* at 60.)

In 2010, pursuant to the 2005 Travel Management Rule, the Forest Service issued the CHR Project Decision Notice ("the Decision Notice"). (*See* Doc. 5-3.) The 2005 Travel Management Rule "requires designation of those roads, trails, and areas that are open to motor vehicle use on National Forests." (*Id.* at 8.) The Decision Notice establishes motorized use designations in the Wild and Scenic River Corridor of the Flathead River where the Gravel Bar and Blankenship Bridge are located. (*Id.* at 7.) Under the Decision Notice, overland motorized vehicle use from Blankenship Bridge is prohibited to a dispersed campsite if such use will require more than 300 feet of travel from designated roads, but otherwise motorized vehicle use is allowed. (*Id.* at 16.)

Dispersed overnight camping has historically occurred on the Gravel Bar. (*See, e.g.*, Doc. 5-2 at 14; Doc. 5-6 at ¶¶ 4–5; Doc. 5-8 at ¶¶ 3–5.) According to Friends, use of the Gravel Bar for recreation and camping has "grown exponentially" since 2020. (Doc. 5 at 10.) Affidavits submitted by property owners around Blankenship Bridge and the Gravel Bar allege that, because of this increased use, the scenic, geologic, and habitual qualities of the area are seriously threatened. (*See, e.g.*, Doc. 5-6 at ¶¶ 2, 4–5; Doc. 5-8 at ¶¶ 3–5; Doc. 5-9 at ¶¶ 3–5.) According to the affidavits, users of the area pollute the Flathead River with human and food waste, as well as with emissions and sedimentation from vehicles that, at times, drive directly into the Flathead River. (*See, e.g.*, Doc. 5-8 at ¶ 7.) In

3

several instances, vehicles have become stuck in the River after failing to cross through it, even as recently as May 2022. (*See* Doc. 5-6 at 5; Doc. 5-9 at ¶ 3; Doc. 5-19.) Additionally, the affiants report witnessing illegal campfires and firework use, which they assert raises concerns about wildfires and damage to habitat. (*See, e.g.*, Doc. 5-12 at ¶¶ 4–5 (Fire Chief for Blankenship Rural Fire District stating that the "unsupervised and unmanaged nature of these campfires and uses on the Gravel Bar are likely to lead to a wildfire").)

On May 27, 2022, the Forest Service implemented an emergency closure order of the Blankenship Bridge area, prohibiting motorized vehicle use and camping due to the River's high water levels. (Doc. 5-10.) The emergency closure is intended to be "short-term," (*id.*), and on June 14, the Forest Service issued an area restriction order extending the closure until July 15, 2022, (Doc. 7-1 at 1). The current temporary closure order was issued pursuant to a regulation wholly unrelated to the regulations under which Friends brings a claim. The current closure resulted from "the high-water level of the Flathead River," not from a finding of significant adverse effects. (Doc. 7-1 at 1.)

**II.    Procedural Background**

Friends filed the current action on May 16, 2022, requesting a declaration that the Forest Service is in violation of the Wild and Scenic Rivers Act because of its failure to timely issue a new Comprehensive River Management Plan and that

4

the Forest Service is in violation of the Organic Act because it has allegedly failed to properly monitor and evaluate motorized use at the Gravel Bar. (Doc. 1 at 15.) Friends also requests "[t]hat the Court issue a temporary restraining order and preliminary injunction enjoining dispersed overnight camping southwest of Blankenship Bridge on the Gravel Bar . . . pending release and implementation of the final Comprehensive River Management Plan for the Flathead River." (*Id.* at 15–16.) Friends moved for a temporary restraining order and preliminary injunction on July 1, 2022, arguing that an injunction is warranted due to the imminent harm dispersed overnight camping causes to the Blankenship Bridge and Gravel Bar, and it seeks to enjoin overnight camping use at the Gravel Bar. (Doc. 4.) The Forest Service argues that such an injunction is unwarranted and would be detrimental to the public. A hearing on Friends' motion was held on July 12, and the emergency closure order is set to expire on July 15.

### III. Statutory Framework

Because neither the Wild and Scenic Rivers Act nor the Organic Act, through which the Travel Management Rule was promulgated, provide separate standards for review, Friends' claims are reviewed under the standards of the Administrative Procedures Act ("APA"). *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the relevant portion of the APA, the "reviewing court shall . . . compel agency action unlawfully withheld

or unreasonably delayed." 5 U.S.C. § 706(1). "A court may compel agency action under the APA when the agency (1) has a clear, certain, and mandatory duty, and (2) has unreasonably delayed in performing such duty." *Vaz v. Neal*, 33 F.4th 1131, 1136 (9th Cir. 2022) (quotation marks and citation omitted).

### A. Wild and Scenic Rivers Act

Congress enacted the Wild and Scenic Rivers Act based on the policy of preserving, protecting, and enhancing select rivers and their immediate environments "for the benefit and enjoyment of present and future generations." 16 U.S.C. § 1271. Areas protected under the Act are given one of three designations: wild, scenic, or recreational. *Id.* § 1273(b). The area at issue here is "recreational," *id.* § 1274(a)(13), which is defined as "[t]hose rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past," *id.* § 1273(b)(3).

For rivers designated before 1986, such as the Flathead, "all boundaries, classification, and plans shall be reviewed for conformity within the requirements of this subsection within 10 years through regular agency planning processes." *Id.* § 1274(d)(2). The "requirements of this subsection" are articulated in § 1274(d)(1), which states that the relevant agency "shall prepare a comprehensive management plan for such river segment to provide for the protection of the river

values." *Id.* "The plan shall address resource protection, development of lands and facilities, user capacities, and other management practices necessary or desirable to achieve the purposes of this chapter." *Id.*

### B. Travel Management Rule

The Travel Management Rule requires the designation of roads, trails, and areas for motor vehicle use within National Forests. *See* 36 C.F.R. Ch. II, Pt. 212, Subpt. B. The Travel Management Rule specifically authorizes the designation of motor vehicle use for dispersed camping, and the "responsible official may include in the designation the limited use of motor vehicles within a specified distance of certain forest roads or trails where motor vehicle use is allowed." *Id.* § 212.51(b). In general, the public must have an opportunity to participate in the designation of roads, trails, and areas where motor vehicle use may occur. *Id.* § 212.52(a). Public involvement is not required, however, in the event of temporary emergency closures. *Id.* § 212.52(b). Specifically,

> If the responsible official determines that motor vehicle use on a . . . road or . . . trail or in an area on National Forest System lands is directly causing or will directly cause considerable adverse effects on public safety or soil, vegetation, wildlife, wildlife habitat, or cultural resources associated with that road, trail, or area, the responsible official shall immediately close that road, trail, or area to motor vehicle use until the official determines that such adverse effects have been mitigated or eliminated and that measures have been implemented to prevent future recurrence.

*Id.* § 212.52(b)(2). Following the designation of trails, roads, or areas for motor vehicle use, the "responsible official shall monitor the effects of motor vehicle use on designated roads and trails and in designated areas . . . consistent with the applicable land management plan, as appropriate and feasible." *Id.* § 212.57.

## LEGAL STANDARD

An applicant for injunctive relief must show a likelihood of success on the merits, a likelihood of irreparable injury, that the balance of the equities favors preliminary relief, and that preliminary relief is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction can take two forms[:]" prohibitory or mandatory. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878 (9th Cir. 2009). "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits" while "[a] mandatory injunction orders a responsible party to take action." *Id.* at 878–79 (quotation marks omitted). Mandatory injunctions disturb, rather than maintain, the status quo, so they are disfavored and "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Id.* at 879 (quotation marks omitted). Because Friends seeks to alter, rather than maintain, the status quo, it faces this heightened standard.

## ANALYSIS

Neither party disputes that there has been increased public use of the Blankenship Bridge and Gravel Bar over the last two years. Rather, the parties dispute whether that increased use has created a significant problem, and, if so, whether that problem warrants immediate legal redress. According to Friends, the increased use has resulted in a host of problems that must be remedied through judicial action. Friends argues that an injunction of overnight dispersed camping would further the mission of the Wild and Scenic Rivers Act to preserve the pristine beauty of the Flathead River as well as protect the habitat and wildlife found there. Friends argues that the Court should compel agency action to further the Act's interest, as well as compel the Forest Service to close the area until it can properly "monitor" vehicle use consistent with the Travel Management Rule. By contrast, the Forest Service maintains that the increased use of the relevant area has not created any significant problems, and the purportedly small changes that have resulted are best left to resolution at the agency's discretion. The Forest Service also argues that an injunction would contravene the intent of the River's designation as "recreational" under the Wild and Scenic Rivers Act as well as deprive the general public of the use of public lands.

Ultimately, while the conduct Friends alleges is unsavory and unsightly, the increased use Friends complains of does not warrant a mandatory injunction. At

this juncture, Friends has not shown that it is likely to succeed on the merits of its claims. The *Winter* test is conjunctive, which means all four parts of the test must be satisfied for an injunction to issue. Accordingly, because Friends cannot demonstrate a likelihood of success on the merits on this record, its request for injunctive relief is denied.

To prevail on a motion for preliminary injunction, a plaintiff must show either a likelihood of eventual success on the merits or, under the Ninth Circuit's "sliding scale" test, serious questions going to the merits of their claims. *Winter*, 555 U.S. at 20; *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). In cases where the plaintiff seeks to compel agency action under § 706 of the APA, the plaintiff must "assert[] that an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.* 542 U.S. 55, 64 (2004).

Here, to satisfy the showing of a likelihood of success on the merits, Friends must show that it is likely to succeed on its claim under the Wild and Scenic Rivers Act and/or its claim under the Travel Management Rule. As to the former, there is no statutorily enforceable deadline for issuing a new plan, and, at this juncture, Friends have not demonstrated that the Forest Service is out of compliance with the Flathead Plan. Similarly, Friends are unlikely to succeed on the merits of the latter

claim because the manner in which the Forest Service monitors motorized vehicle use is a matter of discretion.

## I.      Wild and Scenic Rivers Act Claim

Friends argues that it is likely to succeed on the merits of its claim under the Wild and Scenic Rivers Act for two reasons: first, that the Forest Service procedurally violated the Act by failing to issue a new Comprehensive River Management Plan, and second, that the Forest Service substantively violated the Act because it failed to adequately monitor the Blankenship Bridge and Gravel Bar as required under the Flathead Plan and the Act.  The Forest Service argues that Friends' procedural argument fails because it misreads the Wild and Scenic Rivers Act requirements regarding the issuance of a Comprehensive River Management Plan and that Friends' substantive argument fails because the Act states only broad objectives for monitoring and protection and dictates no specific requirement for furthering those objectives.  The Forest Service has the better argument on both fronts.

First, Friends improperly reads a statutorily enforceable deadline into the Wild and Scenic Rivers Act that does not exist.  Friends claims that "the Forest Service has violated the [Act], because it is 37-years past due for a new [comprehensive river management plan]." (Doc. 5 at 24.)  Friends' 37-year calculation derives from a combination of language from the Act and language

11

from the Flathead Plan; the Act mandates the issuance of Comprehensive River Management Plan, and because the Flathead River was designated before 1986, the Forest Service was required to review any existing Comprehensive River Management Plan for conformity with the requirements for such a plan within 10 years of 1986. *See* 16 U.S.C. § 1274(d)(2). The Forest Service complied with the statutory requirement to issue a Comprehensive River Management Plan when it issued the Flathead Plan in 1980, and the Flathead Plan itself includes the language that it was intended "to be a comprehensive document for the management of the Flathead National Wild and Scenic River for a five-year period beginning with the date of approval." (Doc. 5-2 at 29.) Friends combines the mandatory language from the Act with the language from the Flathead Plan to create a requirement that the Forest Service should have issued a new Comprehensive River Management Plan in 1985. This interpretation is erroneous, and Friends' reliance on *Sierra Club v. Babbitt*, 69 F. Supp. 2d 1202 (E.D. Cal. 1999), actually underscores Friends' mistaken reading.

In *Babbitt*, the court determined that the agency violated the procedural requirements of the Wild and Scenic Rivers Act because the agency failed to issue a comprehensive plan nine years after the plan should have been issued pursuant to 16 U.S.C. § 1274(d). *Id.* at 1250. But the river segment at issue in *Babbitt* was designated in 1987, which means it, unlike the Flathead, was governed solely by

§ 1274(d)(1), so the Forest Service was required to prepare a comprehensive plan within 3 fiscal years after the date of the river's designation. *See id.* at 1248. Moreover, in *Babbitt*, unlike here, no Comprehensive River Management Plan was issued in the first instance, and so the court determined that the agency had violated the procedural requirements of the Wild and Scenic Rivers Act. *Id.* at 1250. While the plaintiff's request for a mandatory injunction was ultimately granted in *Babbitt*, the procedural violation alone did not support the issuance of the injunction; the procedural violation was considered in the context of the agency's compliance with the substantive requirements of the Act. *Id.* at 1251. The failure to promulgate a comprehensive plan in the first instance eliminated "the ability of the agency to adequately assess the impacts of future plans and actions on the river's [outstandingly remarkable values]," and so the "procedural violation len[t] great weight to assertions that the substantive requirement to preserve and enhance the values for which the river was included in the wild and scenic river system has been violated." *Id.* at 1252. This case is distinguishable from *Babbitt* because the Forest Service issued a Comprehensive River Management Plan as required by § 1274(d)(2) when it issued the Flathead Plan in 1980. Because a plan is in existence, there is a baseline by which to "assess the impacts of future plans and actions." *See id.*

13

Moreover, though the language of the Flathead Plan itself states that it was intended for a five-year period, the Forest Service is correct that this language "says nothing about a statutory or regulatory deadline for issuing a new [comprehensive river management plan], and it does not establish a discrete legal duty for the Forest Service to issue such a plan." (Doc. 10 at 16.) *Riverhawks v. Zepeda*, 228 F. Supp. 2d 1173 (D. Or. 2002), supports that position. In *Riverhawks*, the river at issue was designated in 1968, and a Comprehensive River Management Plan was issued in 1972. *Id.* at 1186. In 2000, the Forest Service authorized motorboat use within the designated section of the river at levels exceeding those that existed when the river was designated 32 years earlier in 1968, and the plaintiffs brought suit claiming that the increased use violated the Wild and Scenic Rivers Act and seeking a mandatory injunction requiring the agency to prepare a recreation plan for the river. *Id.* at 1178. The court emphasized that "§ 1274(d)(1) does not mandate the creation of a 'recreation plan'; it requires only a management plan." *Id.* at 1186. It then rejected plaintiffs' arguments, explaining that it "d[id] not question the need for a comprehensive recreation plan—particularly in light of the fact that the original management plan [wa]s now thirty years old and user demand has increased significantly. . . . Regardless, [the court] cannot find that defendants have failed to act in the face of a clear and mandatory duty." *Id.*

14

Despite the fact that plaintiffs in *Riverhawks* sought a recreation plan rather than a new Comprehensive River Management Plan, *Riverhawks* is nonetheless informative for its emphasis that the Wild and Scenic Rivers Act "requires only a management plan." *Id.* at 1186. It says nothing about updating or reissuing such plans. Applying *Riverhawks* here, the Forest Service is correct that the language of the Plan itself does not give rise to discrete agency action that the Forest Service is required to take and that may be compelled under § 706 of the APA. *See Norton*, 542 U.S. at 64. While it may be generally agreed that the Flathead Plan should be significantly updated or replaced because it has been in place for as long as the plan at issue in *Riverhawks*, in the absence of mandatory authority to update or issue a new comprehensive river management plan, Friends is unlikely to succeed on the merits of its claim that the Forest Service failed to timely issue a new plan under the Wild and Scenic Rivers Act. Additionally, Friends' argument regarding unreasonable delay by the Forest Service in reviewing the Flathead Plan is underdeveloped on this record and therefore unlikely to succeed at this juncture.

In conclusion, Friends have not shown it is likely to succeed on its Wild and Scenic Rivers Act claim because it has not shown that the Forest Service has procedurally or substantively violated the Act.

**II.    Travel Management Rule**

15

Friends argues it is likely to succeed on the merits of its claim under the Travel Management Rule because the Forest Service has failed to adequately monitor and supervise the area as required by 36 C.F.R. § 212.57 and therefore failed to make the determination that motor vehicle use is directly causing adverse effects in the area to warrant closure under § 212.52. (Doc. 5 at 26–27.) The Forest Service argues that Friends has not shown that adverse effects are occurring as to mandate the closure of the area, and, in any event, the manner in which the Forest Service elects to monitor these areas is a matter of discretion. The agency once again has the better position.

While Friends is correct that § 212.52 includes a mandatory temporary closure provision upon a determination that motor vehicle use is causing or likely to cause considerable adverse effects in an area,[1] Friends has not shown that it is likely to succeed in demonstrating that the Forest Service has failed to achieve that objective as a result of purportedly deficient monitoring. When a statute contains a mandatory objective but leaves the agency discretion in deciding how to achieve it, the steps the agency takes toward that objective are not "discrete agency actions" subject to § 706 of the APA. *See Norton*, 542 U.S. at 66. Such is the case here; the part of the Travel Management Rule to which Friends points in support of its

---

[1] The language in the Decision Notice that Friends referenced at the July 12 hearing in support of this argument tracks this regulation. (Doc. 5-3 at 1.)

argument that the Forest Service has failed to adequately monitor the area requires that the responsible official "monitor the effects of motor vehicle use on designated roads and trails" according to the "applicable land management plan, as appropriate and feasible." 36 C.F.R. § 212.57. The rule provides no guidance as to how such monitoring should occur, meaning the method of monitoring is left to the Forest Service's discretion, and Friends provides no persuasive evidence that inadequate monitoring is occurring.

Friends cites to a statement made by Robert Davies, the District Ranger for the Flathead National Forest, to a local newspaper that suggests a noticeable increase in use in the area.[2] (*See* Doc. 5 at 27.) Aside from the fact that the quote does not support Friends' argument that the "Forest Service has admitted it no longer has control of the situation, and adverse effects are occurring," (*id.*), the statement is unpersuasive in light of Davies' sworn statement submitted with the agency's response, (*see* Doc. 10-1). In that sworn statement, Davies details measures the Forest Service has undertaken to manage the increased use of the

---

[2] While the quote in the article is attributed to Davies, (Doc. 5 at 27; Doc. 5-5), the substance of that quote is not included in his sworn statement, (Doc. 10-1). Friends does not ask the Court to take judicial notice of the information, and in any event such a request would be improper because under Federal Rule of Evidence 201(b)(2), the Court may "take judicial notice of [publications] solely as an indication of what information was in the public realm at the time," not of the substance of the publications. *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010).

17

Gravel Bar, including increases in patrols, installing and contracting with a servicer for portable toilets, and posting signage related to proper motorized vehicle routes. (*Id.* ¶ 8.) Thus, contrary to Friends' assertion otherwise, it has not shown that the Forest Service has failed to monitor motorized vehicle use in the area. Accordingly, on the current record, Friends is unlikely to succeed in showing a violation of the Travel Management Rule.

In sum, Friends has not shown, at this stage, that it is likely to succeed on the merits of its claims. Because the *Winter* test is conjunctive, all four parts of the test must be satisfied for an injunction to issue. Accordingly, because Friends has failed to show that the first *Winter* requirement is satisfied, an injunction necessarily cannot issue and the remaining factors need not be discussed.

## CONCLUSION

On this record, Friends has not shown that it is likely to succeed on the merits of its claims. Notably, this determination on the first *Winters* factor is "not binding at trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Accordingly,

IT IS ORDERED that Friends' motion for injunctive relief, (Doc. 4), is DENIED.

IT IS FURTHER ORDERED that, consistent with the Court's admonition at the July 12 hearing, in all documents filed with the Court, the parties shall not use any acronyms or initialisms.

DATED this 14th day of July, 2022.

/s/ *12:47 P.M.*
Donald W. Molloy, District Judge
United States District Court